UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 07-50118 |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND |
| vs. | ) | RECOMMENDATION ON |
| | ) | DEFENDANT'S MOTION TO |
| STEVE BUCHANAN, | ) | SUPPRESS [DOCKET 16] |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

This matter is before the court pursuant to an indictment charging Defendant Steve Buchanan with one count of Manufacturing a Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). [Docket 1]. Mr. Buchanan moves the court to suppress statements made to law enforcement agents and evidence seized as a result of a search of his residence on February 14, 2006, pursuant to a search warrant. [Docket 16]. In support of his suppression motion, Mr. Buchanan argues that the search warrant was invalid and, thus, all of the fruits of the search should be suppressed. [Docket 17]. Mr. Buchanan requests a <u>Franks</u>[1] hearing to determine the validity of the search warrant. The government resists Mr. Buchanan's motion to suppress

---

[1] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

and request for a <u>Franks</u> hearing.  [Docket 18].  Mr. Buchanan's motion to suppress was referred to this magistrate judge for a report and recommendation to the district court pursuant to Chief Judge Karen E. Schreier's standing order dated June 11, 2007, and 28 U.S.C. § 636(b)(1)(B).

## FACTS

An evidentiary hearing on Mr. Buchanan's motion was held on Monday, April 21, 2008.  Mr. Buchanan and his attorney were present as was the attorney for the government.  Three witnesses testified in person at the hearing: Lyle Tolsma and Steve Ardis, both special agents with the South Dakota Division of Criminal Investigation (hereafter "DCI"), and Brian Behlings, a deputy sheriff with the Custer County Sheriff's Office.  From the testimony and exhibits admitted at the hearing, the court finds the following facts.

On February 13, 2006, a "cold call" (i.e. an unsolicited call from a person with whom DCI had no previous connection) was received at the DCI office concerning alleged drug activity in Custer, South Dakota.  The call was referred to Agent Tolsma, as his assignment is the southern Black Hills, in which Custer is located.

The person who called, deemed by Agent Tolsma a "source of information" ("SOI"), identified themselves by their first name only and gave a telephone number at which they could be reached.  Agent Tolsma, to the best

of his knowledge, did not know the SOI and had never had any previous contact with the SOI.

During this phone call, the SOI told Agent Tolsma that they had been to the house of Steven Buchanan located at 25406 Wind Song Valley in Custer, South Dakota, three days before, on February 10, 2006.  The SOI said that Mr. Buchanan had offered the SOI methamphetamine while they were at his house.  The SOI described seeing approximately one-half of a gram of methamphetamine in crystal form on an aluminum "foiler."  Agent Tolsma explained that an aluminum "foiler" is a piece of aluminum foil which holds methamphetamine on top while a source of heat is applied to the bottom, creating a chemical reaction with the methamphetamine that turns it to smoke, allowing the user to inhale it.  The SOI told Agent Tolsma that they had been around methamphetamine several times in the past and were familiar with its appearance.  The SOI told Agent Tolsma that the chemical smell coming from inside Mr. Buchanan's residence was overwhelming, so much so that the SOI departed the residence after a short stay due to the odor.

Agent Tolsma testified that the process of manufacturing methamphetamine produces a noticeable smell.  In some cases, the smell can be detected a block away from its source.

3

The SOI also identified a second person, a woman, who Agent Tolsma later identified as a "confidential informant" ("CI").  The SOI indicated that the CI was involved in manufacturing methamphetamine with Mr. Buchanan.

After receiving this information, Agent Tolsma and Agent Ardis conducted a "knock and talk" with Mr. Buchanan at approximately noon on February 14, 2006.  Mr. Buchanan's house is in a rural area, slightly wooded, with a trailer house approximately 400 feet away from the house.  There was also a garage, an enclosed lean-to, and a barn on the grounds.

Agent Tolsma and Agent Ardis arrived at Mr. Buchanan's house unannounced and knocked on the door.  When Mr. Buchanan answered, he stepped outside the house, closing the door behind him.  The agents explained who they were and that they were investigating an allegation that Mr. Buchanan was involved in manufacturing methamphetamine.  Mr. Buchanan refused to allow the agents into his house without a search warrant, indicating that it was extremely messy.  Mr. Buchanan never made any incriminating statements to the agents.  Agent Tolsma indicated that he smelled no odor indicative of methamphetamine manufacturing while standing outside Mr. Buchanan's door.

Immediately after leaving Mr. Buchanan's house, Agents Tolsma and Ardis went to the house of the CI, also identified by the SOI, to conduct a "knock and talk."  The agents once again identified themselves to the CI and

indicated that they wanted to talk to her about an allegation that she was involved in manufacturing methamphetamine with Mr. Buchanan. The CI confirmed that Mr. Buchanan was currently making methamphetamine at his residence. The CI told the agents that she had provided Mr. Buchanan with approximately 50 packets of pseudoephedrine since October 2005. Pseudoephedrine is an ingredient used in manufacturing methamphetamine. She indicated that Mr. Buchanan gave the CI methamphetamine in return for the pseudoephedrine. The CI indicated she had last been at Mr. Buchanan's house the night before at approximately 10:00 p.m., when she gave Mr. Buchanan two boxes of pseudoephedrine tablets. She gave the agents names of other individuals who had also purchased pseudoephedrine for Mr. Buchanan. The CI said that the last time she used methamphetamine was on February 11, 2006, when she and Mr. Buchanan smoked methamphetamine from a light bulb.

The CI let the agents into her house, where the agents observed Mason canning jars filled with Coleman lantern fuel. The CI told them she used the lantern fuel to break down the pseudoephedrine tablets. The CI itemized things she had seen at Mr. Buchanan's house that he was using for producing the drug, including coffee filters, striker plates from matchbooks being dissolved in liquid acetone, tubing in the shower, a double hot plate, and a red tank which Mr. Buchanan used to transport and store anhydrous ammonia.

The CI stated that Mr. Buchanan had been manufacturing methamphetamine at his home since May of 2005.

The agents told the CI that if she cooperated with them, they would communicate this fact to the prosecutor in the case and that her cooperation would "go a long ways" toward helping her.  The CI agreed to conduct a recorded phone call with Mr. Buchanan.  Because there was no cell phone coverage available at the CI's house, the agents had the CI enter their vehicle and the three drove together to the outskirts of Custer where the CI placed a phone call to Mr. Buchanan on her own cell phone, which the agents connected to a recording device.  A transcript of the recorded phone call was entered into evidence as Exhibit 126.[2]  The call took place at 3:25 p.m. on February 14, 2006.  A tape recording of the phone call was also entered into evidence at Exhibit 128.

In the phone call, Mr. Buchanan advised the CI of the agents' visit to his house and the fact that they were investigating possible methamphetamine manufacturing.  Initially, Mr. Buchanan cautioned the CI that the state investigators were "probably listening in," indicating an awareness on Mr. Buchanan's part of the possibility that his conversation was not confidential.  Mr. Buchanan and the CI engaged in some discussion of who

---

[2]The exhibit was received provisionally, subject to the government's right to object to any inaccuracies it discovered in the transcript.  The government never lodged any post-hearing objections to the transcript.  Accordingly, the exhibit is now received without reservation.

could have told law enforcement that Mr. Buchanan was manufacturing methamphetamine.  Mr. Buchanan relayed to the CI that the agents had asked to come into his house, and Mr. Buchanan told the CI that he had refused, saying that "my house is trashed, I live like a pig, I said I don't want people . . . coming in to my house.  I'm embarrassed, you know?"

The CI asked Mr. Buchanan, "What do I do?"  Mr. Buchanan replied "Nothing. . . . Sit on your butt, you know what I mean, [expletive], you know what I mean."  The CI then responded "Well I don't know, what . . ." Mr. Buchanan in turn stated "Yeah, just cool it."  The CI said something unintelligible on the tape, then Mr. Buchanan stated:

> Yeah I know, don't worry about [expletive], well I gotta clean up my you know, key ends, and garbage and stuff I got laying all over my house and stuff you know and make it look a little more presentable in case somebody comes in.  I'd hate to, you know.

Later, Mr. Buchanan stated that "there's a bunch of stupid [expletive] people around that you know, they get in trouble and then they try and get us in trouble.  You know, you know other people in trouble.  So, I'm, so hell, I'm not doing anything wrong."  The CI then asked, "Do you think you are ok?"  To which Mr. Buchanan replied, "Yeah, yeah, yeah, like I said you know, hey.  It is scary but like I said, I ain't done nothing so I ain't worrying about it but I do have to clean up my garbage cause if they come into my house and bunch of people like that. . ."

Mr. Buchanan and the CI then engaged in an elliptical discussion about the whereabouts of an unnamed item.  The CI asked Mr. Buchanan, "Well what about me?"  Mr. Buchanan replied, "Don't worry about that, it's gone."  The CI responded, "Ok, well you know (inaudible) oh it's gone, ok."  Mr. Buchanan then told the CI, "Yeah, it's gone.  You know what I mean, you can't piss around and stuff so . . . I imagine they are probably trying to get a warrant and all this [expletive] right now so . . ."

A discussion then ensued about whether the police that visited Mr. Buchanan were state or federal, from Custer or Rapid City.  Then the CI wondered what would happen if the police showed up at her house and other occupants of the house admitted the police.  She then asked Mr. Buchanan pointedly, "And where did you put it?"  Mr. Buchanan replied "I haven't you know, time to get rid . . ."  The CI interjected, "I know, but where?" Mr. Buchanan replied "It ain't at your place so I don't know, like I says, you know . . ."

After this phone conversation, Agents Tolsma and Ardis took the CI back to her house.  They then retrieved Phil Hespin, the Custer County Sheriff and deputy sheriff Brian Behlings.  The law enforcement agents then went to Mr. Buchanan's house at approximately 4:00 p.m.  Once there, they secured the residence to ensure no evidence was destroyed or removed.  Mr. Buchanan

8

was handcuffed and taken to the Custer County Sheriff's Office and detained by Deputy Behlings.

Prior to leaving, Agents Tolsma and Ardis conducted a "protective sweep" of Mr. Buchanan's house to ensure that there were no other persons in the house that could pose a danger to the officers who were securing the house. No detailed search was conducted.  Rather, the agents restricted themselves to looking in locations large enough to hide a human being.  Agent Tolsma indicated that he smelled no odor during this search that was indicative of methamphetamine manufacturing.  However, he also testified that he thought the agents left the doors to the buildings open so the buildings could "air out" prior to conducting a search pursuant to a warrant.

After securing the Buchanan residence, Agents Tolsma and Ardis went to the Custer County Sheriff's Office to prepare an application and affidavit in support of a search warrant.  The application and affidavit were then read over the phone to a state magistrate judge in Rapid City, South Dakota.  The magistrate judge orally issued the search warrant.  This phone conversation was taped and a transcript of the conversation was entered into evidence at the hearing as Exhibit 1.[3]  Agent Tolsma relayed the above information received

---

[3]Exhibit 127, entitled "Search Warrant Affidavit" was also entered into evidence.  Agent Tolsma testified that this was an abbreviated form of the affidavit actually presented telephonically to the magistrate judge over the phone.  He testified that Exhibit 127 was created because he is required to leave a copy of the search warrant at the residence at the time of the search.

from the SOI, from the CI, and the recorded telephone conversation between the CI and Mr. Buchanan.

There were a number of facts omitted from Agent Tolsma's application and affidavit in support of the search warrant.  Agent Tolsma did not tell the magistrate judge that the SOI had not given his or her full name, nor that Agent Tolsma did not know the SOI and had had no previous contact with the SOI prior to the SOI's cold call to DCI on the day before.  Agent Tolsma did not tell the magistrate judge that the CI was also completely unknown to him prior to his contacting her on February 14, 2006.  Agent Tolsma did not report to the magistrate judge that he had been physically present both outside and inside Mr. Buchanan's home on that day and had not observed any odor indicative of methamphetamine manufacture.  Finally, in his affidavit and application for the search warrant, Agent Tolsma characterized Mr. Buchanan's statements in the recorded phone call with the CI as follows: "Buchanan advised the CI that he . . . is currently in the process of cleaning out his residence, referring to the clandestine equipment and chemicals."

While Agent Tolsma was preparing the affidavit and application for search warrant at the Custer County Sheriff's Office, Deputy Behlings testified that he approached Tolsma and indicated that Mr. Buchanan had expressed a wish to make a phone call to Chris Beesley, an attorney in Custer who handles criminal cases.  Deputy Behlings could not recall Agent Tolsma's exact

response, but believed that the substance of his response was that he did not want Mr. Buchanan to make any phone calls.  Deputy Behlings testified that Mr. Buchanan was in Belings' custody while he was detained at the sheriff's office and that Mr. Buchanan was never allowed to make any phone calls. Agent Tolsma denied knowing that Mr. Buchanan had ever asked to speak to an attorney until some months later when testimony to that effect was elicited from Deputy Behlings at a suppression hearing held in state court.

Agent Ardis was with Agent Tolsma while Tolsma was preparing the affidavit and application for search warrant.  He testified that he never heard this conversation with Deputy Behlings.  However, Agent Ardis did say that he may have left the room where Agent Tolsma was working to visit the restroom at some point and thus been absent when Deputy Behlings approached Tolsma with Mr. Buchanan's request.

After securing the search warrant from the state magistrate judge, Agents Tolsma and Ardis approached Mr. Buchanan in the booking area where he was seated on a bench with his wrists handcuffed in front of his body. Agent Ardis read Mr. Buchanan his <u>Miranda</u>[4] rights, which Mr. Buchanan waived.  Agents Tolsma and Ardis then proceeded to interrogate Mr. Buchanan. The agents then took Mr. Buchanan with them to Mr. Buchanan's residence to assist them in their execution of the search warrant.  Perhaps explaining the

---

[4]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

urgency of the agents' actions, Agent Ardis testified that the search warrant was for daytime execution and they were required to conduct their search prior to 8:00 p.m. that day.  Thus, assuming the search got underway sometime between 5:00 and 6:00 p.m., the agents would have had only two to three hours to conclude their search of several buildings which, from the photos introduced into evidence (see Exhibits 109-112, 114, 118-119, 124-125), was tantamount to searching a landfill.

Exhibit 2 was introduced into evidence and sets forth many of the items found in the search of Mr. Buchanan's home that were incriminating as to the manufacture and use of methamphetamine.  The agents testified that Mr. Buchanan assisted the agents in the discovery of some of the items, but also that some of the items were discovered by the agents without Mr. Buchanan's assistance.  The items were found, variously, in a plastic storage container inside a cardboard box in a bedroom closet, behind a curtain under a bathroom sink, in a pile of approximately several hundred aluminum pop cans piled up on the living room floor, on the living room floor itself, in a bucket on a kitchen table so piled with junk that the table itself was completely obfuscated, on a kitchen countertop, on top of a coffee table in the living room, in a wood-burning stove in the garage, in the trash, and in plain view in the yard approximately 50 to 70 feet from Mr. Buchanan's house.

Agent Tolsma testified to the thorough nature of a search pursuant to a search warrant where the object is to find evidence of drug use, possession, or manufacturing. Agent Tolsma indicated that such searches typically include going through all drawers and closets, ripping open mattresses if necessary, pulling up floor boards if necessary, going through trash, looking in the yard, opening containers, and looking in outbuildings. As to every item discovered on Exhibit 2, Agent Tolsma testified that law enforcement agents executing the search warrant would have discovered the items even without Mr. Buchanan's assistance.

Of the 22 items seized during the search of Mr. Buchanan's home, only three items tested positive for any substance indicative of drug use or manufacture. See Exhibit 2. A foiler and a razor blade tested positive for the presence of methamphetamine and a Pyrex measuring cup tested positive for the presence of red phosphorous, a substance gleaned from matchbook striker covers that is used in the manufacturing of methamphetamine. Id. Several other items, including a jeweler's bag with residue, a Tupperware container, a metal spoon with residue, dirty rubber gloves, tubing, a screen with residue, salt from a 2-liter soda bottle, used coffee filters, and a sandwich bag with the corner ripped off were either not tested to determine what residue was on them, or they were tested and the results were negative for any illegal or incriminating substance. See Exhibit 2.

13

## DISCUSSION

Mr. Buchanan moves to suppress evidence and statements obtained by law enforcement during the execution of the search warrant on February 14, 2006, at his residence.  Mr. Buchanan alleges that the evidence seized from his residence and statements made to law enforcement during the search, should be suppressed as "fruit of the poisonous tree."   Mr. Buchanan advances two arguments in support of his motion:  (1) the search warrant was defective because Agent Tolsma omitted and mischaracterized material facts and (2) the search was tainted because the agents used Mr. Buchanan's statements to assist them in their search and Mr. Buchanan made these statements after having invoked his right to counsel under the Sixth Amendment.

As to the alleged invalidity of the search warrant, Mr. Buchanan specifically alleges that Agent Lyle Tolsma, in submitting his affidavit in support of the search warrant recklessly omitted material facts:  (1) that the CI and SOI were unknown to Agents Tolsma and Ardis prior to February 13, 2006; (2) that neither the CI nor the SOI had ever provided reliable information to the agents in the past; (3) that the CI was a possible suspect in the investigation; and (4) that the agents assured the CI that his or her cooperation would be noted by the prosecutor.  Mr. Buchanan also alleges that Agent Tolsma deliberately included false information in his affidavit by characterizing Mr. Buchanan's statements to the CI during the recorded telephone

14

conversation as indicating that he was in the process of removing from his residence all drug-manufacturing equipment and chemicals when, in fact, Mr. Buchanan claims that it is clear from the context of the conversation that he was actually referring to cleaning his house in the conventional sense of the word.

The government concedes that all statements made by Mr. Buchanan after he invoked his right to counsel should be suppressed unless they are necessary for impeachment purposes at trial.  However, the government maintains that the search warrant is valid in every respect and that the items seized pursuant to the search warrant would have been discovered without Mr. Buchanan's statements at the scene of the search.

The positions taken by the parties raise two main issues for the court: (1) whether the search warrant was valid and (2) whether the search was tainted by statements Mr. Buchanan made at the scene of the search.

## A.    Preliminary Showing for a <u>Franks</u> Hearing

As a preliminary matter, a defendant is only entitled to a <u>Franks</u> hearing if he makes a substantial showing that an affiant to a search warrant application knowingly or intentionally, or with reckless disregard for the truth, made false statements or omitted material facts and that the alleged statements were necessary to a finding of probable cause.  <u>Franks</u>, 438 U.S. at 155-56.  "Whether [the defendant] will prevail at that hearing is, of course, another issue."  <u>Id.</u> at 172.

15

The court finds that Mr. Buchanan is entitled to a <u>Franks</u> hearing.  The right under the Fourth Amendment to be free from unreasonable searches and seizures is a fundamental one and must be safeguarded from police overreaching.  The probable cause requirement for search warrants "would be reduced to a nullity" if a criminal defendant did not have recourse to a hearing before a reviewing judge to challenge the veracity of a search warrant affidavit. <u>Id.</u> at 168.  Because a pre-search proceeding is necessarily *ex parte* and is often done in haste, it "is likely to be less vigorous... [because] [t]he magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations." <u>Id.</u> at 169.  Here, the court finds that Mr. Buchanan has the right to a <u>Franks</u> hearing based on his showing of the admitted, specific omissions from the affidavit about Agent Tolsma's lack of knowledge of the CI and SOI.  Accordingly, the court allowed evidence at the hearing as to the <u>Franks</u> issue and will now address the substance of Mr. Buchanan's <u>Franks</u> argument.

**B.    Validity of the Search Warrant**

The Fourth Amendment requires that a search warrant may be issued only upon a showing of probable cause.  <u>United States v. Williams</u>, 477 F.3d 554, 557 (8th Cir. 2007).  In order to challenge a finding of probable cause under <u>Franks</u>, a defendant must show, by a preponderance of the evidence, that (1) the affiant, in preparing the search warrant affidavit, deliberately and knowingly, or with reckless disregard for the truth, included falsehoods; and

16

(2) the affidavit lacks sufficient content to support a finding of probable cause if the challenged information is set aside.  Franks, 438 U.S. at 171-72; United States v. Humphreys, 982 F.3d 254, 259 n.2 (8th Cir. 1992).  The same analysis applies to omissions of facts in that the defendant must show (1) that the affiant intentionally or recklessly omitted material facts thereby making the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.  Humphreys, 982 F.3d at 259 n.2.  The defendant's challenge must be more than conclusory and must be supported by the evidence.  Franks, 438 U.S. at 171.  The defendant must specify which parts of the affidavit are claimed to be false and must provide a statement of supporting reasons or an "offer of proof."  Id. "Allegations of negligence or innocent mistake are insufficient."  Id.  Finally, the defendant may only challenge the veracity of the affiant's statements and not that of nongovernmental informants because a reviewing court is concerned only with whether the affiant knowingly and deliberately included falsehoods or recklessly omitted the truth.  Id.

A "reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists." United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993) (citing Illinois v. Gates, 462 U.S. 213, 236 (1983)).  Further, affidavits supporting search warrants are considered presumptively valid.  Franks, 438 U.S. at 171.  "Probable cause requires that

17

the circumstances set forth in an affidavit supporting an application for a

search warrant demonstrate a 'fair probability that contraband or evidence of a

crime will be found in a particular place.' " United States v. Tyler, 238 F.3d

1036, 1038 (8th Cir. 2001) (quoting Gates, 462 U.S. at 238)).  In determining

whether probable cause exists, courts look to the totality of the circumstances

and consider all the facts "for their cumulative meaning" rather than evaluating

each fact independently.  Williams, 10 F.3d at 593; Tyler, 238 F.3d at 1038.

"Applications and affidavits for issuance of a warrant should be examined

under a common sense approach and not in a hypertechnical fashion."

Williams, 10 F.3d at 593 (citing United States v. Ventresca, 380 U.S. 102, 109

(1965)).  The key question in determining whether a search warrant is

supported by a finding of probable cause is whether, viewing all of the

information collected by law enforcement as a whole, a "reasonable person

could suspect that a search would uncover evidence of crimes committed by

[the defendant]." Tyler, 238 F.3d at 1038.

> The Supreme Court summarized the probable cause standard as follows:
>
> The task of the issuing magistrate is simply to make a practical,
> common-sense decision whether, given all the circumstances set
> forth in the affidavit before him, including the "veracity" and "basis
> of knowledge" of persons supplying hearsay information, there is a
> fair probability that contraband or evidence of a crime will be
> found in a particular place.  And the duty of a reviewing court is
> simply to insure that the magistrate had a "substantial basis for …
> conclud[ing]" that probable cause existed.

Gates, 462 U.S. at 238-39 (citation omitted).

### 1.   Whether Agent Tolsma Deliberately Misrepresented Mr. Buchanan's Statement About Cleaning House

Mr. Buchanan argues that Agent Tolsma deliberately misrepresented to the magistrate his statement about "cleaning house" to be a reference to getting rid of incriminating evidence, when Agent Tolsma knew that Mr. Buchanan was really talking about cleaning house in the conventional sense.  Taking Mr. Buchanan's statements about cleaning house in the overall context of his conversation with the CI, the court has no trouble reaching the conclusion, as did Agent Tolsma, that when Mr. Buchanan indicated he was going to clean his house, that he was referring to getting rid of incriminating evidence before the police returned.  Facts gleaned from the recorded conversation with the CI that support this inference include the elliptical conversation the CI had with Mr. Buchanan about the location of the unnamed item, the coy nature of the conversation given Mr. Buchanan's admission that he was aware of the probability that police were listening in to the conversation, and Mr. Buchanan's prediction that the police would return to his house very soon with a search warrant.

The court and Agent Tolsma may perhaps be wrong in this conclusion, but the fact that a conclusion is in error does not render it a deliberate falsehood.  Any mistake Tolsma may have made in this regard would have been an understandable mistake, given the context of the conversation in which Mr. Buchanan's statement was made.  A mistaken assumption or negligence

19

will not support a <u>Franks</u> challenge to the validity of a search warrant.   <u>See</u>

<u>Franks</u>, 438 U.S. at 171 (a defendant challenging a search warrant affidavit

must make more that mere allegations of negligence or innocent mistake).

**2.   Agent Tolsma's Omission of Facts from the Affidavit**

The court next turns to Mr. Buchanan's allegation that the omission of

certain facts about the CI and the SOI from Agent Tolsma's affidavit renders

the search warrant invalid.

When search warrant affidavits are based upon information supplied by

informants, the key question is whether such information is reliable.  <u>Williams</u>,

10 F.3d at 593.

> Information may be sufficiently reliable to support a probable
> cause finding if the person providing the information has a track
> record of supplying reliable information, or if it is corroborated by
> independent evidence.  If information from an informant is shown
> to be reliable because of independent corroboration, then it is a
> permissible inference that the informant is reliable and that
> therefore other information that the informant provides, though
> uncorroborated, is also reliable.

<u>Id.</u> (citing <u>Gates</u>, 462 U.S. at 233-34; <u>Draper v. United States</u>, 358 U.S. 307,

313 (1959)).

Thus, an informant is considered to be reliable and credible if the

supplied information is at least partially corroborated by other sources.

<u>Humphreys</u>, 982 F.2d at 259; <u>see also</u> <u>United States v. Murphy</u>, 69 F.3d 237,

240 (8th Cir. 1995) (court held that search warrant was based on probable

cause when the affidavit contained only (1) the informant's statement that the

20

defendant was a recently-released convicted murderer who possessed illegal firearms at his residence and (2) the affiant's statement that he had confirmed the defendant's address and release from prison).  Probable cause may be found, for example, when the information supplied by one informant is consistent with specific details provided by a second, independent informant. United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998).  Thus, reciprocal corroboration may render informant information reliable and credible enough to support a finding of probable cause.  Id.; United States v. Nieman, __F.3d__, 2008 WL 860781 at *4 (8th Cir. April 2, 2008).

Although the credibility and reliability of informants are important considerations in the probable cause inquiry, "they are not 'separate and independent requirements to be rigidly exacted in every case.' " Tyler, 238 F.3d at 1039 (quoting Gates, 462 U.S. at 230)).  That is, an informant's statements must be weighed within the totality of the circumstances.  Tyler, 238 F.3d at 1039.  In addition, probable cause may be established by the observations of law enforcement and by circumstantial evidence.  United States v. Wells, 223 F.3d 835, 839 (8th Cir. 2000).  An important consideration in establishing the credibility and reliability of an informant is whether law enforcement had the opportunity to meet personally with the informant to assess his credibility and whether the informant's information is based on first-hand knowledge rather than rumor or innuendo.  Nieman, __F.3d__, 2008 WL 860781 at *4; see also Wells, 223 F.3d at 839 (court noted that police must engage in suitable

21

corroboration of the informant's information if the informant's reputation cannot be assessed because the informant is anonymous); United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994) (court noted that "there is an inherent indicia of reliability in the richness and detail of first hand observation" by an informant and that the ability of police to question the informant face-to-face gives greater weight to the police's decision to rely on the informant's first-hand observations).

The Eighth Circuit addressed the issue of confidential informants in Tyler, 238 F.3d 1036.  In Tyler, the defendant pled guilty to two counts of possession of crack cocaine with the intent to distribute after police executed a search warrant and found evidence of drugs.  Id. at 1038.  On appeal, the defendant argued that this evidence should have been suppressed because the underlying search warrant lacked probable cause.  Id.  The defendant specifically challenged the credibility and reliability of the information supplied to law enforcement by a drug offender turned police informant because the informant was not known previously to the police as a reliable source of information.  Id.

The court rejected the defendant's argument, stating that the information supplied by the informant had been independently verified by the police, in part through a controlled buy of cocaine from the defendant.  Id. at 1039.  The court noted that it "strongly endorsed the use of corroboration as a method of confirming the reliability of the information given to police," and "[e]ven 'the

22

corroboration of minor, innocent details can suffice to establish probable cause.'" Id. (quoting United States v. Ramos, 818 F.2d 1392, 1397 n. 7 (8th Cir. 1987)); cf Wells, 223 F.3d at 840.

The court also held that the informant's statements were presumptively credible because the statements were made against the informant's penal interest. Id. The informant admitted to illegal activities (e.g., past narcotic purchases from the defendant) beyond that which the police already knew. Id. Such statements against penal interest "typically 'carry considerable weight.'" Id. (quoting United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996)).

In Smith, a paid confidential informant made three controlled drug purchases from defendant while under police surveillance. United States v. Smith, 266 F.3d 902, 904 (8th Cir. 2001). State police officers applied for a search warrant and submitted an affidavit noting the three transactions and that the informant had provided reliable information to the police in the past. Id. at 904, 905. The defendant argued that the search warrant was invalid in part because the affidavit contained a false statement regarding the use of the informant by the police in the past. Id. at 905. The court found that even if the affidavit for the search warrant contained knowingly false or misleading statements, the remaining content of the affidavit–the record of controlled drug purchases–was sufficient to establish probable cause. Id.

In contrast, in Wells, the Eighth Circuit found that the search warrant affidavit did not support a finding of probable cause. Wells, 223 F.3d at 839.

23

Police received two anonymous tips from callers stating that they had *received* information that the defendant and two other men were responsible for two drive-by shootings.  Id. at 837.  However, only *one* of the anonymous callers stated the vehicle and weapons used in the shootings were hidden in the garage of a duplex rented by the defendant's girlfriend at a specified address. Id.  A witness to one of the shootings also told police a dark-colored vehicle was seen leaving the area.  Id.  Police verified that the utilities for the duplex were in the name of the defendant's girlfriend, that the girlfriend was indeed the defendant's girlfriend, and that all three of the alleged shooters were associates of each other.  Id.  This information was included in the search warrant affidavit.  Id.

The affiant, Officer Lane, proceeded to the duplex where he observed the defendant washing a dark *blue Buick* Park Avenue automobile.  Id.  In the affidavit, Officer Lane stated that the defendant's vehicle matched the description given by the witness to one of the shootings, when in fact the witness had described the vehicle as a new *Lincoln* that was either dark *green or black* in color with tinted windows.  Id. at 837-838.   Based on this information, Officer Lane applied for and received a search warrant of the duplex where weapons were found, thus leading to the defendant's indictment. Id. at 838.

The defendant moved to suppress the evidence seized from the duplex on the ground that the search warrant lacked probable cause.  Id.  At the

24

suppression hearing, Officer Lane acknowledged the difference between the witness' description of the vehicle used in the shooting and the vehicle Officer Lane observed at the duplex.  Id.  The district court found that the affidavit's description of the vehicle was central to the conclusion that the vehicle used in the shootings matched that seen in front of the duplex.  Id.  The court found that this misstatement or omission misled the judge who issued the search warrant and that "a properly reconstructed warrant lacked sufficient information to support a finding of probable cause that evidence of the shootings would be found at [the duplex]."  Id.  The court concluded that the defendant had established a Franks violation and that the evidence seized from the duplex should be suppressed.  Id.

The government appealed to the Eighth Circuit, but only as to the district court's determination that a properly reconstructed search warrant lacked sufficient information to support a finding of probable cause.  Id. at 839.  The Eighth Circuit upheld the district court's ruling, finding that the police failed to properly corroborate information provided by the anonymous callers.  Id.  The court explained as follows:

> When suspicions arise not from any observations of police officers "but solely from a call made from an unknown location by an unknown caller," whose reputation cannot be assessed, the police must engage in suitable corroboration of the alleged criminal activity.  Suitable corroboration must exhibit sufficient indicia of reliability in order for an anonymous tip to provide either a reasonable suspicion of criminal activity or probable cause to arrest or to search.

Id.

In determining that the search warrant lacked probable cause, the court found the following facts persuasive: (1) the callers remained anonymous and unknown to the police; (2) the callers stated that they received information regarding the defendant, thus, the callers "did not report any first-hand information or intimate details that could provide a reliable basis for this purported knowledge"; (3) the police were only able to corroborate innocent details of the location of the duplex, the alleged shooters' association with each other, and the relationship between the defendant and his girlfriend; and (4) the police failed to corroborate any allegation of criminal conduct by the defendant or any allegation of criminal activity at the duplex.  Id. at 839-40. The court found that the link between the shootings and the duplex was missing if the vehicle description was set aside because only one anonymous caller stated that the vehicle used in the shooting was located at the duplex. Id.  Without corroboration from another source–the witness or another informant–the information provided by only one of the anonymous callers was insufficient to establish probable cause.  Id. at 840.  Thus, the court upheld the district court's suppression of the evidence seized from the duplex.  Id.

The Eighth Circuit has also held that an affiant is not required to include an informant's criminal history or cooperation under a plea agreement if the informant's information is at least partially corroborated.  United States v. Flagg, 919 F.2d 499, 501 (8th Cir. 1990).  Because informants frequently have

26

criminal histories and often provide information to the government in the hope of obtaining leniency or some other benefit, a magistrate judge would not be misled by the omission of such information as such information is not clearly critical to the finding of probable cause.  Id.; see also Williams, 477 F.3d at 558 (court held that "an affidavit is not robbed of its probative effect by its failure to mention that the informant 'was a paid informant who avoided prosecution by virtue of her testimony...' ") (citing United States v. Milton, 153 F.3d 891, 896 n. 3 (8th Cir. 1998)); United States v. Allen, 297 F.3d 790, 795 (8th Cir. 2002) ("search warrant affidavits need not provide judicial officers with all the details of bargaining between police and arrested persons from whom they are seeking to get information").

Agent Tolsma omitted the following facts from his application and affidavit in support of the search warrant:  that the CI and the SOI were unknown to him prior to the day before, February 13, 2006; that the CI was a suspect in the investigation; that the agents assured the CI that her cooperation would be noted by the prosecutor; and that during two visits to the Buchanan residence by Agent Tolsma that day, including a trip through the interior of that structure, he had smelled no odor indicative of methamphetamine manufacture.

Speaking as a magistrate judge, the court would find the information omitted from Agent Tolsma's affidavit to be material and important to a determination of the reliability of the information given by the CI and SOI.

27

However, the court cannot conclude that, had the information been included, probable cause would have been lacking.

There is no evidence that Agent Tolsma omitted the evidence in an attempt to mislead the magistrate judge.  Instead, the evidence showed that the affidavit was prepared in haste.  Any omission was almost certainly due to oversight and the time constraints rather than any attempt to deceive.  In any event, whether the omission was deliberate or inadvertent, the warrant is sustained or must fall based on the reliability of the information provided by the CI and the SOI.  The court finds that the information provided by these two individuals was sufficiently reliable to support the magistrate judge's probable cause determination.

First, the court notes that the CI and SOI's information, relayed independently of one another, corroborated each other.  Both indicated that they had been offered or received methamphetamine from Mr. Buchanan at his house within four days of the application for the search warrant.  Both indicated that they had seen evidence of methamphetamine manufacturing at Mr. Buchanan's residence, in the form of an overpowering odor in the case of the SOI, and equipment and ingredients personally supplied in part by the CI in the information relayed by the CI.   See Fulgham, 143 F.3d at 401 (reciprocal corroboration may render information from two informants reliable and credible enough to support a finding of probable cause).

28

In addition, the information provided by both the SOI and CI were based on their first-hand knowledge rather than on rumor or innuendo, a fact that bolsters their credibility.  See Robertson, 39 F.3d at 893 (court noted that "there is an inherent indicia of reliability in the richness and detail of first hand observation" by an informant).  Also, in admitting to purchasing drugs from Mr. Buchanan and to providing drug-manufacturing supplies to Mr. Buchanan, the CI provided information against her penal interests, lending support to the presumption that her statements were reliable.  See Tyler, 238 F.3d at 1039.

The CI had evidence in her home that she was manufacturing methamphetamine there, but the fact that the CI was dissolving tablets of pseudoephedrine at her house is neither corroborative of Mr. Buchanan's guilt nor of his innocence.  If fact, the CI had told Agent Tolsma that it was her practice to give the tablets to Mr. Buchanan, so the presence of the means used to dissolve the tablets at her house was inconsistent with what she told Agent Tolsma.

However, the most significant corroboration of the information supplied by the SOI and the CI came from Mr. Buchanan himself during the recorded conversation with the CI.  Mr. Buchanan made a candid admission that, after the police had visited his home, the unnamed item he and the CI were discussing elliptically was "gone" because "you can't piss around."  See Exhibit Nos. 126, 128.  He talked candidly about getting rid of the unnamed item, or

his plans to do so, and assured the CI that "it ain't at your place."  Id.  Then, of course, there was the comment discussed above that the police were probably obtaining a search warrant and that he was going to "clean house" before the police returned.  Id.  In light of the totality of the circumstances, the court finds that the omissions concerning Agent Tolsma's lack of experience with, and knowledge about, the SOI and the CI were not crucial to the determination of probable cause.  See Flagg, 919 F.2d at 501.

A more significant omission is the fact that Agent Tolsma himself was present at Mr. Buchanan's house the day he applied for the search warrant, both outside the house during the "knock and talk," and inside the house during the protective sweep, and he observed no odor indicative of methamphetamine manufacturing.  This is an important, first-hand observation of the affiant himself that failed to corroborate the information supplied by the CI and SOI that Mr. Buchanan was currently manufacturing methamphetamine.  Given the nature of the odors generated during the manufacture of methamphetamine as described by Agent Tolsma, there should have been some identifiable odor when Agents Tolsma and Ardis walked through the house during their protective sweep.  The fact that there was no such odor is significant and material.  The information was not included in the affidavit for the search warrant and should have been.

However, the court concludes that, even if this information had been included in the affidavit, there was still probable cause to support the issuance

30

of the search warrant.  Agent Tolsma's first-hand observations that there was

no odor emanating from Mr. Buchanan's house tended to make the information

from the CI and the SOI that Mr. Buchanan was *manufacturing*

methamphetamine look unsupported or, at the very least stale.  However, it did

not undermine the CI and SOI's assertion that Mr. Buchanan *used*

methamphetamine very recently in his house, an activity that, if it had indeed

taken place, would have created very little residual smell at the time Agent

Tolsma was present on February 14th.  Based on the evidence of

Mr. Buchanan's *use* of methamphetamine, from the CI, the SOI, as well as

Mr. Buchanan himself in the recorded phone call, there were sufficient reliable

facts from which the magistrate could find that there was a 'fair probability

that contraband or evidence of a crime [would] be found" in Mr. Buchanan's

house.  Tyler, 238 F.3d at 1038 (quoting Gates, 462 U.S. at 238).

        In light of the strong presumption that search warrant affidavits are

valid, the court finds that Mr. Buchanan has not satisfied his burden under

Franks to show that the search warrant in this case was not supported by

probable cause.  See Franks, 438 U.S. at 171.  Examining the totality of the

circumstances under a common-sense approach, the court finds that the

search warrant in this case was valid, the search of Mr. Buchanan's residence

was proper, and the evidence seized from the residence should not be

suppressed based on an allegation that the warrant itself was invalid.  See

<u>Williams</u>, 10 F.3d at 593.  It remains to be determined whether the evidence should be suppressed under Mr. Buchanan's alternate theory.

## C.     Seizure of Evidence as Affected by Violation of Mr. Buchanan's Right to Counsel Under the Fifth Amendment[5]

Mr. Buchanan invoked his right to counsel while being detained at the Custer County Sheriff's Office, a fact not disputed by the government.[6]  In fact, on the basis of Mr. Buchanan's invocation, and the agents' subsequent interrogation of him, the government voluntarily agrees to suppress all statements Mr. Buchanan made after his invocation of his right to counsel, except if such statements are needed for impeachment purposes.  However, the court finds that Mr. Buchanan's statements were part and parcel of the search of his home.  Accordingly, despite the government's concession that it will not use Mr. Buchanan's *statements* at trial, the court finds that it nevertheless must address whether those statements so tainted the search of

---

[5]Because the Sixth Amendment right to counsel attaches or is triggered only when adversarial judicial criminal proceedings commence, Mr. Buchanan does not argue that his Sixth Amendment right to counsel was violated when law enforcement continued to question him after he expressed his desire to speak with an attorney.  <u>See</u> <u>Massiah v. United States</u>, 377 U.S. 201, 205-06 (1964). Thus, the court's inquiry is limited to the issue of whether law enforcement's violation of Mr. Buchanan's Fifth Amendment right to counsel requires the suppression of derivative physical evidence.

[6]Because the government concedes that Mr. Buchanan asked for a lawyer, the court need not resolve the conflict in the evidence as to whether Agent Tolsma knew of Mr. Buchanan's request.

Mr. Buchanan's home that evidence from the search warrant should be suppressed.

### 1.     Whether an <u>Edwards</u> Violation Occurred

The benchmark case for the issue of defendant statements taken in violation of the Fifth Amendment is <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981). In <u>Edwards</u>, the police had arrested Mr. Edwards pursuant to an arrest warrant and sworn complaint charging him with robbery, burglary, and first-degree murder.  <u>Edwards</u>, 451 U.S. at 478.  At the police station, an officer advised Mr. Edwards of his <u>Miranda</u> warnings, and the defendant consented to being questioned.  <u>Id.</u>  Mr. Edwards provided a taped statement denying involvement in the crimes and offering an alibi defense and told police that he wished to "make a deal." <u>Id.</u> at 479.  Mr. Edwards also requested the assistance of counsel prior to negotiating with the police.  <u>Id.</u>

Although questioning ceased at that point, two detectives, colleagues of the officer who had questioned Mr. Edwards previously, returned the next day and informed Mr. Edwards that they wished to continue questioning him.  <u>Id.</u> The detectives again provided Mr. Edwards with his <u>Miranda</u> warnings and then played a tape-recorded statement of an alleged accomplice who had implicated Mr. Edwards in the crime.  <u>Id.</u>  Mr. Edwards then implicated himself in the crime.  <u>Id.</u>

Prior to trial, Mr. Edwards moved to suppress his confession on the ground that law enforcement violated his <u>Miranda</u> rights by continuing to

question him after he had requested the assistance of counsel.  Id.  The trial court initially granted the motion to suppress, but subsequently reversed its ruling by finding that Mr. Edwards' confession was voluntary.  Id. at 479-80. After being convicted in state court, Mr. Edwards appealed to the state supreme court, again raising the suppression issue.  Id. at 480.  The state supreme court held that, although Mr. Edwards had invoked his right to remain silent and his right to assistance of counsel while being interrogated by police, Mr. Edward subsequently waived both rights during the second interview when he voluntarily confessed.  Id.

The Supreme Court reversed the judgment of the state supreme court, finding that the use of Mr. Edwards' confession at trial violated his Fifth and Fourteenth Amendments as articulated in Miranda v. Arizona.  Id.  The Court held that: (1) once an accused "has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights," and (2) once an accused "expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Id. at 484-85. The Court found that the police violated Mr. Edwards' Fifth Amendment rights by continuing to interrogate him after he had invoked his right to counsel, and

that the "fruits of the interrogation," that is, his confession, could not be used against Mr. Edwards at trial.  Id. at 485.

The Court relied on the holdings in Miranda to support its ruling.  Id. The Court noted that "Miranda itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.' " Id. (citing Miranda, 384 U.S. at 474).  The Court reaffirmed Miranda's holding that "an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation."  Id. at 482.  The Court concluded that "it is inconsistent with Miranda and its progeny for the authorities, at their insistence, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."  Id. at 485.

The relevant sequence of events in Mr. Buchanan's case fairly parallels Edwards in that Mr. Buchanan invoked his right to counsel and then law enforcement provided Miranda warnings, secured Mr. Buchanan's waiver, and proceeded to interrogate him at the police station and at his residence.[7]  Here,

---

[7]In accordance with Supreme Court precedent, the court "attach[es] no significance" to the fact that Agents Tolsma and Ardis did not know that Mr. Buchanan had requested counsel prior to questioning.  See Arizona v. Robertson, 486 U.S. 675, 687 (1988).  "In addition to the fact that Edwards focuses on the state of mind of the suspect and not of the police, custodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel...The police department's failure to honor that request cannot be justified by the lack of diligence of a particular officer."  Id. at 687-88.

the court cannot find from the factual record developed at the suppression hearing that Mr. Buchanan voluntarily initiated conversation with Agents Tolsma and Ardis after the agents secured the search warrant and transported Mr. Buchanan to his residence to assist in the search.  Id. at 484-85 (before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the suspect himself initiates dialogue with the authorities).  Nor did the agents passively listen to Mr. Buchanan's statements.[8]  Id. at 485 ("Had [the defendant] initiated the meeting [with police], nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial.").  Rather, police interrogated Mr. Buchanan; the police directly questioned him or engaged in practices reasonably likely to

_____

[8]"When the suspect has initiated the dialogue, Edwards makes clear that the right to have a lawyer present can be waived" if the totality of the circumstances indicate a valid waiver had occurred.  Wyrick v. Fields, 459 U.S. 42, 46-47 (1982).

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation."  In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

Edwards, 451 U.S. at 486, n.9.  Because the government has not raised the issue of waiver, the court will not address the merits of this argument.

evoke an incriminating response from a suspect.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Based on the record before the court, and pursuant to the rule in Edwards, the "fruits of the interrogation," that is, Mr. Buchanan's statements, must be suppressed.  Edwards, 451 U.S. at 485.  As stated earlier, the government concedes that Mr. Buchanan's statements should be suppressed and does not raise the argument of waiver.  However, establishing that an Edwards violation occurred is necessary to determining whether the search was tainted by that violation.

### 2.    Whether an Edwards Violation Requires the Suppression of Derivative Physical Evidence

"Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality."  United States v. Wipf, 397 F.3d 677, 683-84 (8th Cir. 2005).  The exclusionary rule, originally applicable to Fourth Amendment violations, has been extended to apply to violations of the Fifth Amendment, although the exclusionary rule as applied under the Fifth Amendment "serves interests and policies that are distinct" from the Fourth Amendment.  United States v. Villalba-Alvarado, 345 F.3d 1007, 1010 (8th Cir. 2003); see also Burgess v. Dretke, 350 F.3d 461, 469 (5th Cir. 2003) (' "fruits" analysis does not apply as fully in the Fifth Amendment context as it does to Fourth Amendment violations").  Further, the exclusionary

37

rule applies to *any* "fruits," of a constitutional violation, including physical, tangible evidence.  United States v. Crews, 445 U.S. 463, 470 (1980).

Circuits differ as to whether the fruit of the poisonous tree doctrine, or derivative evidence rule, first articulated in Wong Sun v. United States, 371 U.S. 471 (1963), in the context of the Fourth Amendment applies to an Edwards violation in the context of the Fifth Amendment.  Compare Burgess, 350 F.3d at 469, n. 20 and United States v. Cannon, 981 F.2d 785, 789 (5th Cir. 1993) (courts held that "fruit of the poisonous tree" doctrine was inapplicable to Edwards violations) with United States v. Downing, 665 F.2d 404, 409 (1st Cir. 1981) (court held that "any evidence obtained as a result of violating [defendant's] Fifth Amendment right to have counsel present during interrogation cannot be introduced against him at trial").  The Fifth's Circuit's rationale in support of its position on this issue is that the derivative evidence doctrine "applies only when [an] actual constitutional violation occurs, and not [a] violation of [the] prophylactic rule[s]." Cannon, 981 F.2d at 789 (citing United States v. Tedford, 875 F.2d 446, 451 (5th Cir. 1989)).  In contrast, the First Circuit's position is that, in order to deter "impermissible police conduct," the "evidentiary fruits" of an accused statements as well as the statements themselves must be suppressed.  Downing, 665 F.2d at 409.

38

The Eighth Circuit cursorily addressed this issue in <u>Krimmel v. Hopkins</u>, 44 F.3d 704 (8th Cir. 1995).[9]  In <u>Krimmel</u>, police contacted the defendant, Vernon Krimmel, at his home regarding the murder of Louis Garland, who previously had hired Mr. Krimmel for odd jobs.  <u>Id.</u> at 706.  After police persuaded Mr. Krimmel to go to the police station for questioning, the police provided <u>Miranda</u> warnings and began the interrogation, but, after admitting that he was inside the victim's home and discovered the victim's dead body, Mr. Krimmel requested an attorney.  <u>Id.</u>  A public defender arrived and informed the police that Mr. Krimmel refused to be interviewed further.  <u>Id.</u>

The police arrested Mr. Krimmel, but returned later and reinitiated the interview after providing new <u>Miranda</u> warnings.  <u>Id.</u>  The police informed Mr. Krimmel that he would receive his necessary medication only after he answered questions about the homicide.  <u>Id.</u>  In a taped statement, Mr. Krimmel confessed to murdering the victim, to being seen at the victim's home by a meter reader, and to hiding his blood-stained clothing, the victim's

---

[9]The court notes that <u>Krimmel</u> is a case reviewing a habeas petition filed by a state prisoner rather than a direct appeal of an issue in the context of a federal court case.  Therefore, the <u>Krimmel</u> court applied a presumption of correctness to the state court's findings on the constitutional issue presented, a factor that would not be present if the issue were presented in the first instance in federal court.  <u>Krimmel</u>, 44 F.3d at 709.  However, Mr. Krimmel's habeas petition was decided on the merits after a review of the record, and the court noted that it would come to the same conclusion even if it did not accord deference to the state court findings.  <u>Id.</u>  Thus, although <u>Krimmel</u> is not precisely on point with Mr. Buchanan's case because it is a habeas decision, it nonetheless provides guidance to the court.

wallet, and other physical evidence with the assistance of a friend.  Id.  The deputy county attorney arrived and another taped statement was taken.  Id. Police obtained additional incriminating information from the friend that Mr. Krimmel identified in his statement.  Id.

At trial, the government introduced Mr. Krimmel's first taped statement, the physical evidence, the testimony from the meter reader, and the testimony from Mr. Krimmels' friend.  Id. at 707.  A jury convicted Mr. Krimmel of first-degree murder, and the state supreme court affirmed his conviction.  Id.  After the state court denied Mr. Kimmel's state habeas petition, Mr. Krimmel filed a habeas petition in federal court, arguing, in pertinent part, that police violated Edwards by reinitiating questioning after he had invoked his right to counsel and that those statements, along with the derivative physical evidence and testimony by other witnesses, should be suppressed.  Id. at 709.

The Eighth Circuit held that Mr. Krimmel's statements taken after he had invoked his right to counsel and in violation of Edwards could be admitted for impeachment and rebuttal purposes only, but not in the government's case in chief.  Id.  The court also rejected Mr. Krimmel's argument that the physical evidence and witness testimony derived from his illegally-obtained statements should be suppressed.  Id.  The court held that there was "no Fifth Amendment violation when the State introduced the physical evidence and the testimony of Krimmel's friend and the meter reader in its case-in-chief, even assuming this evidence would not have been discovered [by other means]."  Id.  The court

40

relied on Michigan v. Tucker, 417 U.S. 433, 449-51 (1974) for the similar

holding that "the Fifth Amendment was not violated by the State's use of the

identity of a witness obtained during an illegally obtained statement."  Id.

   To this court's knowledge, since Krimmel, the Eighth Circuit has not

addressed directly the particular issue of whether derivative physical evidence

obtained as a result of an Edwards violation must be suppressed under the

"fruit of the poisonous tree" doctrine.  Krimmel is still good law in this circuit,

and the court is unaware of any subsequent case that would have potentially

altered the Eighth Circuit's approach to this issue.  Further, the relevant

holding in Krimmel is bolstered by the Supreme Court's and the Eighth

Circuit's treatment of physical evidence derived from a Miranda violation and

the rationale behind said treatment.

   The relationship between Miranda and Edwards is a close one– both

cases promulgated rules designed to protect an accused's Fifth Amendment

privilege against self-incrimination by ensuring (1) that the accused

understands that he has the right to remain silent and the right to have

counsel present during custodial interrogation and (2) that police cease

interrogating the accused once he has invoked his right to counsel.  Michigan

v. Harvey, 494 U.S. 344, 350 (1990); Michigan v. Tucker, 417 U.S. 433, 446

(1974).  Adding "a second layer of protection to the Miranda rules," "Edwards

thus established another prophylactic rule designed to prevent police from

badgering a defendant into waiving his previously asserted Miranda rights."

41

Harvey, 494 U.S. at 350.  The Supreme Court has characterized the rule in
Edwards as a prophylactic rule designed to protect the Fifth Amendment
privilege against self-incrimination during custodial interrogation.  Id. at 344.

In Tucker, which the Eighth Circuit relies on in Krimmel, the issue before
the Supreme Court was whether the testimony of a witness whose identity was
discovered as the result of the defendant's statement taken without benefit of
the full Miranda warnings should be suppressed under the "fruit of the
poisonous tree" doctrine.  Tucker, 417 U.S. at 433.  In Tucker, police provided
Miranda warnings to the defendant prior to questioning, but failed to inform
the defendant that he would be provided counsel if he could not afford one.  Id.
at 436.  The defendant waived his Miranda rights and provided incriminating
statements to police.  Id.  Finding that the statements were not the product of
police coercion, the Court concluded that the unwarned questioning "did not
abridge respondent's constitutional privilege against compulsory self-
incrimination, but departed only from the prophylactic standards later laid
down by this Court in Miranda to safeguard that privilege."  Id. at 446.  The
Court further stated that the Miranda safeguards "were not intended to 'create
a constitutional straightjacket,' but rather to provide practical reinforcement
for the right against compulsory self-incrimination."  Id. at 444.

Although the Court agreed that the defendant's statements taken in
violation of Miranda should be suppressed from use in the government's case
in chief, the Court refused to find that *derivative* evidence should be

42

suppressed in cases where statements were voluntary and uncoerced.  Id. at

448.  The Court explained that cases involving involuntary statements go to the

heart of the Self-Incrimination Clause of the Fifth Amendment, "which, by

definition, must involve an element of coercion."  Id.  In such cases, a

presumption exists that the evidence is untrustworthy because of pressures

brought to bear on the defendant that "may override a particular suspect's

insistence on innocence."  Id.

When there is no evidence of police coercion, as in the facts in Tucker,

there is no reason to believe that derivative testimony of a third party was

untrustworthy "simply because [defendant] was not advised of his right to

appointed counsel."  Id. at 449.  The Court found that "the police conduct here

did not deprive [defendant] of his privilege against compulsory self-

incrimination as such, but rather failed to make available to him the full

measure of procedural safeguards associated with that right since Miranda."

Id. at 444.  In considering society's interest in the effective prosecution of

criminals and the interest in "making available to the trier of fact all concededly

relevant and trustworthy evidence," the Court refused to exclude relevant

derivative testimony of a third-party witness.  Id. at 450-51.

In United States v. Patane, 542 U.S. 630 (2004), the Supreme Court, in a plurality opinion, addressed the issue of whether law enforcement's failure to provide full Miranda warnings prior to interrogation required the suppression of the physical fruits of a defendant's unwarned yet voluntary statements.

Justice Thomas wrote for the plurality consisting of himself, Justice Scalia and then-Chief Justice Rehnquist.  Id. at 633.  Justice Thomas first went to some length to characterize the Miranda rule as a prophylactic rule. The plurality contrasted its prior decision in Dickerson, in which the Supreme Court characterized the rule in Miranda as "a constitutional rule that Congress may not supersede legislatively, " with the Elstad Court's earlier characterization of the Miranda rule as a prophylactic rule.  See Dickerson v. United States, 530 U.S. 428, 444 (2000); Oregon v. Elstad, 470 U.S. 298, 306 (1985).  The Dickerson Court cited Elstad, however, without overruling it. Dickerson, 530 U.S. at 429.  In the plurality decision in Patane, Justice Thomas recognized the evolution of the characterization of the Miranda rule, but reiterated the Elstad Court's statement that the Miranda rule was a "prophylactic rule employed to protect against violations of the Self-Incrimination Clause."  Patane, 542 U.S. at 636.

Given the status of the Miranda rule as prophylactic rather than a constitutional right in and of itself, the plurality refused to extend the "fruit of the poisonous tree" doctrine to exclude nontestimonial evidence obtained as a result of voluntary statements given even in the absence of required Miranda

44

warnings.  Id. at 636, 642.  The plurality discussed the relationship between

Miranda and the Self-Incrimination Clause of the Fifth Amendment, stating

that the "core protection afforded by the Self-Incrimination Clause is a

prohibition on compelling a criminal defendant to testify against himself at

trial."  Id. at 636-637.  The privilege against self incrimination is a

"fundamental *trial* right," and the goal of the Fifth Amendment is to "safeguard

the trustworthiness of testimony at trial and the fairness of the trial."  Id. at

641 (emphasis in original) (citation omitted); United States v. Faulkingham,

295 F.3d 85, 92 (1st Cir. 2002) (citing Elstad, 470 U.S. at 308).

   The plurality explained that law enforcement does not violate an

accused's Fifth Amendment rights by failing to provide Miranda warnings;

rather the accused's constitutional rights would be violated by *the admission* of

unwarned statements *at trial*.  Id. at 641.  Accordingly, the exclusion of such

statements is "a complete and sufficient remedy" for a Miranda violation.  Id. at

641-42.  However, statements taken in violation of Miranda, and, for that

matter, in violation of Edwards, may be used for impeachment or rebuttal

purposes because unwarned statements are "presumed to have been coerced

only for certain purposes and then only when necessary to protect the privilege

against self incrimination."  Id. at 644.

   The plurality stated that the protections of the Self-Incrimination Clause

are limited to testimonial evidence, and the "[i]ntroduction of the

nontestimonial fruit of a voluntary statement ... does not implicate the Self-

45

Incrimination Clause [because] [t]he admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." Id. at 643, 44; see also Elstad, 470 U.S. at 304 ("[t]he Fifth Amendment, of course, is not concerned with nontestimonial evidence."). The plurality concluded that, although the "physical fruit of actually coerced statements" must be suppressed, the exclusionary rule should not be extended to suppress the physical evidence derived from unwarned, yet voluntary statements. Id. at 644; see also Villalba-Alvarado, 345 F.3d at 1013 (In the Eighth Circuit, "the exclusionary rule as applied under the Fifth Amendment does not require the suppression of physical evidence derived from a voluntary, non-Mirandized statement.").

Justice Kennedy filed an opinion in which Justice O'Connor joined wherein both Justices concurred in the result reached by the plurality. Id. at 644-645. Justice Kennedy wrote specially for two reasons: to make clear the fact that he did not believe the Dickerson opinion undermined earlier decisions which had allowed the admission of physical evidence even though such evidence was obtained through an unwarned interrogation. Patane, 542 U.S. at 644-645 (Kennedy, J., concurring) (citing Oregon v. Elstad, 470 U.S. 298 (1985); New York v. Quarles, 467 U.S. 649 (1984); and Harris v. New York, 401 U.S. 222 (1971)). Justice Kennedy also wanted to write separately to make his point that he felt it was unnecessary to reach the issue decided by the plurality as to whether the police's failure to give Patane the full Miranda warnings

46

should be held to be a violation of Miranda.  Id. at 645.  Thus, between the

plurality and the concurrence, five Justices were in favor of allowing the

admission of physical evidence derived from an unwarned interrogation that

was not coerced.  Id. at 633-645.[10]

The Supreme Court's treatment of physical evidence derived from a

Miranda violation bolsters the Eighth Circuit's treatment in Krimmel of

physical evidence stemming from an Edwards violation.  See Krimmel, 44 F.3d

at 709.  Because both Miranda and Edwards promulgated prophylactic rules

designed to protect the Fifth Amendment's privilege against self incrimination

(see Harvey, 494 U.S. at 350), it is logical that the treatment of physical

evidence derived from voluntary statements taken in violation of either Miranda

or Edwards should be the same.  If Agents Tolsma and Ardis had coerced

Mr. Buchanan into assisting them in the search of his residence, then the

"physical fruit of [his] actually coerced statements" would have to be

suppressed.  Patane, 542 U.S. at 644 (Opinion of Thomas, J.); see also id. at

644-645 (Kennedy, J., concurring).

_____

[10]Justice Souter wrote a dissent in which Justices Stevens and Ginsberg
joined, stating that they would suppress physical evidence derived from
interrogation without the benefit of Miranda as a deterrent to law enforcement
violating Miranda.  Patane, 542 U.S. at 645-647 (Souter, J., dissenting).
Justice Breyer wrote a separate dissent to tie in the Court's opinion in Missouri
v. Seibert, 542 U.S. 600 (2004), and to urge that physical evidence obtained as
a result of an unwarned interrogation would be suppressed unless it was
shown that the failure to give Miranda warnings on the part of the police was in
good faith.  Patane, 542 U.S. at 647-648 (Breyer, J., dissenting).

However, Mr. Buchanan does not make any allegations of coercion nor does the record support any such allegation. Indeed, Agent Tolsma testified that Mr. Buchanan was very helpful and cooperative during the search. Thus, while his statements taken in violation of Edwards must be suppressed from use in the government's case in chief, it does not follow that the purpose of the Fifth Amendment in assuring trustworthy evidence at trial would be furthered by the suppression of physical evidence derived from Mr. Buchanan's voluntary statements. See Patane, 542 U.S. at 639-40 (Opinion of Thomas, J.). Thus, in accordance with the Eighth Circuit's holding in Krimmel and analogous Supreme Court case law, the court recommends that the physical evidence seized during the search of Mr. Buchanan's home, even with the assistance of Mr. Buchanan, should not be suppressed. Thus, the court need not address the government's argument that the physical evidence seized from Mr. Buchanan's home is admissible under the inevitable discovery doctrine.

With regard to the statements made by Mr. Buchanan in response to questioning by law enforcement without the presence of counsel, the court recommends that these statements be suppressed from use in the government's case in chief. However, these statements may be used by the government for impeachment purposes. See Harris, 401 U.S. at 224 (holding that a defendant's statements taken in violation of Miranda are inadmissible in the prosecution's case in chief, but admissible for impeachment purposes to

attack the credibility of defendant's trial testimony, if the trustworthiness of the statement satisfies legal standards).

## CONCLUSION

Based on the evidence adduced at the hearing, the above findings of fact, and the law, the court recommends that Steven Buchanan's motion to suppress [Docket 16] be denied in part and granted in part consistent with the above discussion.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated May 8, 2008.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE

49